UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BONITA CURRIE

                Plaintiff,                        CIVIL ACTION NO. 06-CV-12074-DT

         vs.                         DISTRICT JUDGE ARTHUR J. TARNOW

COMMISSIONER OF                    MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.

_____/

I.      **REPORT AND RECOMMENDATION**

      This Court recommends that Defendant's Unopposed Motion for Summary Judgment (Docket # 15) be **GRANTED** and that Plaintiff's complaint be **DISMISSED**.

II.      **PROCEDURAL HISTORY**

      This is an action for judicial review of the final decision by the Commissioner of Social Security that the Plaintiff was not "disabled" for purposes of the Social Security Act. 42 U.S.C. §§ 423, 1382. The issue for review is whether the Commissioner's decision is supported by substantial evidence.

      Plaintiff Bonita Currie filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") in February 2002.[1] (Tr. 76-79, 351-55, 390). She alleged she had been disabled since February 2001 due degenerative disc disease, carpal tunnel syndrome, and bipolar disorder *Id.* Plaintiff's claim was initially denied. (Tr. 56, 62-65, 356-60). Plaintiff sought a review hearing before an Administrative Law Judge (ALJ). (Tr. 66-67). A hearing took place before ALJ

---

[1]      Plaintiff previously filed applications for DIB and SSI in September 2001, which were initially denied. (Tr. 55, 57-61, 68-70, 74-75, 343-50). Plaintiff did not seek further review. The ALJ re-opened these previous applications under 20 C.F.R. § 404.988(b) and 20 C.F.R. § 416.1488(b) and they were considered in combination with Plaintiff's 2002 applications. (Tr. 16).

Manuel Carde on August 26, 2005.[2]  (Tr. 370-409).  Plaintiff was represented by an attorney at the hearing.  (Tr. 37, 371).  The ALJ denied Plaintiff's claim in a written opinion issued on December 6, 2005.  (Tr. 13-23).  The Appeals Council denied review of the ALJ's decision on March 8, 2006 and the ALJ's decision is now the final decision of the Commissioner.  (Tr. 5-12).

Plaintiff, acting *in pro per*, filed a complaint with this Court appealing the denial of her claims on May 5, 2006.  (Docket # 1).  On September 5, 2006 this Court issued a Scheduling Order directing Plaintiff to file a Motion for Summary Judgment by October 2, 2006.  (Docket # 14).  Plaintiff did not file such a Motion or seek an extension of time to do so.  Defendant timely filed its Motion for Summary Judgment on November 2, 2006.  (Docket # 15).  Plaintiff's Reply to Defendant's Motion was due on or before November 13, 2006 but no reply was ever filed.  *Id.*  Having received no pleadings from Plaintiff as of January 29, 2007, this Court issued an Order to Plaintiff to show cause for her failure to comply with the Court's Scheduling Order.  (Docket # 16).  Plaintiff's response to the Order to Show Cause was due on or before February 9, 2007.  *Id.*  Plaintiff filed no response.  The Scheduling Order provided for review upon the merits whether or not briefs were filed.  Thus, this Report and Recommendation is based upon Defendant's unopposed Motion for Summary Judgment and the administrative transcript.

III.    **MEDICAL HISTORY**

    A.    **Evidence Regarding Plaintiff's Mental Health**

Plaintiff underwent therapy at the Henry Ford Health Systems ("Henry Ford")

---

[2]    The hearing was originally scheduled for April 14, 2005 but was continued because Plaintiff did not obtain counsel until the day before the hearing.  (Tr. 16, 361-69).  Another hearing was held on June 14, 2005 but was continued so that Plaintiff's attorney could submit additional medical evidence and clarify information regarding income earned by Plaintiff after the alleged onset date.  (Tr. 16, 361-81).

Behavioral Health Department between June 2001 and March 2002. (Tr. 182-97, 224-63). She was initially evaluated by a social worker at Henry Ford. (Tr. 182-87). Plaintiff reported that she had previously been diagnosed with bipolar disorder and had been hospitalized in 1990 or 1991 for depression. (Tr. 182). The social worker noted that Plaintiff was vague in terms of her past treatment and symptoms. (Tr. 185). Plaintiff also informed the social worker that she was not taking any medication for psychological problems. *Id.* She denied homicidal ideation but the social worker noted that she had possible suicidal ideation. (Tr. 182, 183). The social worker observed that Plaintiff was well-groomed and cooperative. (Tr. 183). Plaintiff was oriented and displayed no attention or concentration difficulties. Her thought content and processes were appropriate, logical, and coherent. However Plaintiff was depressed, anxious, and labile. She also had marginal insight and judgment. *Id.* The social worker diagnosed Plaintiff with bipolar disorder, currently depressed, and assigned her a Global Assessment of Functioning "(GAF") score of 50 with a GAF score of 60 in the past year.[3] (Tr. 185).

Plaintiff's mental health treatment notes dated June 13, 2001 to July 17, 2001 reflect that Plaintiff was well-groomed and cooperative during her interviews. Her concentration was intact and her thought content and affect were appropriate. Plaintiff expressed no suicidal or homicidal ideation. In June Plaintiff's mood was euthymic and her thought processes were logical and coherent. By July Plaintiff was depressed and her thoughts were circumstantial. (Tr. 191). Plaintiff

_____

[3]        "The GAF is a subjective determination based on a scale of 100 to 1 of 'the clinician's judgment of the individual's overall level of functioning." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* ("DSMV-IV") (Text Revision 4th ed. 2000) at 32. A GAF score of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." (emphasis omitted). *Id.* at 34. A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Id.*

was treated with Klonopin and Depakote. She denied any side effects from these medications but stated that she had insomnia. Plaintiff reported that she was not taking the Depakote as prescribed because she did not know how it would affect her at work. Plaintiff's doctor instructed her to take it as directed. (Tr. 191-92).

On July 17, 2001 Plaintiff was offered "partial hospitalization" at Kingswood Hospital because of severe mood swings, some anxiety, and a report that she had threatened a group therapy peer. It was also noted that her medications needed to be reviewed. (Tr. 174, 179, 193). Plaintiff stated upon admission that she was having paranoid ideations about her co-workers. She also had decreased concentration, energy, and motivation, and had disturbed sleep. (Tr. 174). Plaintiff denied any social anxiety and stated that her most worrisome thought was losing her job even though she was dissatisfied with it. (Tr. 175). Plaintiff also denied any suicidal/homicidal thoughts or auditory/visual hallucinations. *Id.* During a mental status examination, Plaintiff was alert, oriented, and cooperative. Her thought processes and content were logical and appropriate. However, Plaintiff was anxious and restless and her speech was pressured but articulate. (Tr. 176). Plaintiff's memory and concentration were intact. She had fair insight and judgment and her abstract reasoning and fund of knowledge were good. (Tr. 177). Plaintiff's mood was anxious and depressed and her affect was congruent. *Id.*

Plaintiff's hospitalization records state that no indication of bipolar disorder was found in her history and that most of Plaintiff's history related to abuse as a child. Consequently, the doctors discontinued Depakote and instead prescribed Wellbutrin. After a few days, Plaintiff's mood improved. She became more communicative, expressive, and less paranoid. Plaintiff had difficulty sleeping because she thought someone would come into her house to hurt her. Therefore, the

-4-

doctors prescribed Risperdal.  (Tr. 179).  Plaintiff was discharged on August 7, 2001.  Her discharge

diagnosis was depression NOS (not otherwise specified) and she was assigned a GAF score of 65.[4]

Plaintiff thereafter returned to outpatient therapy between August 2001 and March 2002.

(Tr. 195-261).  Her mood was usually described as euthymic and her affect was appropriate.

Plaintiff did not generally display any problems with attention or concentration and her thought

content and processes were appropriate, logical, and coherent.  She did not express any homicidal or

suicidal ideation or planning with some exceptions.  Plaintiff's progress reports note some instances

of medication non-compliance.  (Tr. 221, 244, 258).  On one occasion Plaintiff reported that she had

stopped taking her medication and stated "I don't need medications" and that she was "only here to

get disability pay."  (Tr. 244).  Plaintiff's non-compliance also resulted in the need for emergency

room psychiatric assistance.  (Tr. 221, 258-61).  It was further noted during this time period that

Plaintiff planned to return to work in September 2001 although she complained that her employers

should pay her the same as college educated employees because she could "do everything they can

do."  (Tr. 196).  Plaintiff also searched for alternative employment.  (Tr. 195).

In April 2002 Dr. Zahra Khademian reviewed Plaintiff's medical records and completed a

Psychiatric Review Technique form.  Dr. Khademian concluded that Plaintiff did not have a severe

mental impairment and noted that Plaintiff's symptoms did not satisfy the diagnostic criteria for

Listing 12.04 (Affective Disorder).  (Tr. 265, 268).  Dr. Khademian also found that Plaintiff had only

mild restrictions of activities of daily living, mild difficulties in maintaining social functioning and

concentration, persistence, or pace, and had never decompensated.  (Tr. 275).

---

[4]      This score indicates "[s]ome mild symptoms (e.g., depressed mood and mild
insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy,
or theft within the household), but generally functioning pretty well, has some meaningful
interpersonal relationships." DSM-IV at 34.

**B.**   **Evidence Regarding Plaintiff's Physical Health**

Plaintiff was involved in a motor vehicle accident in July 2000. She did not seek medical treatment until a few days after the accident. (Tr. 145). Plaintiff reported to her treating physician, Dr. Vanessa Robinson, that she had sharp pain in her back which radiated into her arms. She also reported a decreased ability to move her neck and headaches. *Id.* An examination showed that Plaintiff had cervical muscle spasms with tenderness over the lower lumbar spine. A straight leg raising test was positive on the left at 30 degrees. *Id.* Dr. Robinson advised Plaintiff to undergo work rest but Plaintiff stated that she wanted to continue working. Dr. Robinson prescribed Flexeril and told Plaintiff to return to see her in 3 months. (Tr. 145-46).

Plaintiff returned to Dr. Robinson in November 2000 and reported numbness and tingling in both hands with pain radiating into her arms. She also stated that she had pain across her shoulders and in her neck. (Tr. 147). An examination showed that Plaintiff had a positive Tinel's and Phalen's signs in both hands. (Tr. 148). Plaintiff was prescribed wrist splints, Flexeril, and Naprosyn. *Id.* A subsequent EMG indicated that Plaintiff had mild bilateral median carpal tunnel syndrome ("CTS"). There was no evidence of left upper extremity radiculopathy or lexopathy. (Tr. 149).

Plaintiff was treated at the Henry Ford Neurosurgery Clinic in December 2000 by Dr. Henry Bartkowski. (Tr. 150). Plaintiff reported a history of bilateral CTS and of non-surgical treatment for her cervical spine. *Id.* She also told Dr. Bartkowski that the symptoms associated with her cervical spine had significantly improved with treatment. *Id.* Dr. Bartkowski's examination revealed that Plaintiff had 5/5 motor strength throughout with 2+ reflexes. He noted that she had no objective sensory loss and a full range of neck motion. *Id.* Dr. Bartkowski recommended that Plaintiff have an MRI taken of her cervical spine. (Tr. 151). An MRI of Plaintiff's cervical spine taken December

-6-

29, 2000 showed disc herniations and/or spondylotic ridges with cord compression greatest at C4-C5 and to a lesser extent at C5-C6 and C6-C7.  (Tr. 152).

Plaintiff subsequently saw Dr. Fred Junn, a neurosurgeon, regarding her CTS and cervical spine.  Dr. Junn noted that Plaintiff was using Flexeril and Naprosyn on an intermittent basis.  (Tr. 154-55).  An examination was unremarkable.  Dr. Junn reported that Plaintiff had full range of motion of her cervical spine and upper extremities.  A Phalen's sign was negative, no weakness was detected, and no evidence of sensory loss was present.  Dr. Junn further stated that the remainder of Plaintiff's motor, sensory, and reflex examinations were unremarkable although Plaintiff had bilateral radial pulses.  Dr. Junn found that there was no EMG collaberation of Plaintiff's reported CTS symptoms, concluding that her CTS was likely symptomatic and mild.  He advised Plaintiff to avoid direct pressure on her elbows while driving and sleeping and to try a foam elbow splint.  (Tr. 155).

Plaintiff thereafter requested that Dr. Robinson conduct a physical examination.  (Tr. 156).  Plaintiff saw Dr. Robinson on February 13, 2001 seeking work disability because she could not adequately perform her job.  (Tr. 157).  No examination findings of Plaintiff's neck, back, or extremities were noted.  (Tr. 158).  Dr. Robinson wrote a letter rendering Plaintiff disabled from 2/12/01 to 3/12/01 and recommended that Plaintiff continue to wear her wrist splints.  *Id.*  Plaintiff reported back to Dr. Robinson on March 12, 2001 with the same complaints.  No relevant examination findings were noted.  Dr. Robinson wrote another letter rendering Plaintiff disabled from 3/12/01 to 4/16/01 and noted that Plaintiff was to follow up with Neurosurgery.  (Tr. 159-60).  On May 1, 2001 Dr. Robinson restricted Plaintiff to limiting grasping, squeezing, and carrying with both hands until May 30, 2001 due to her bilateral CTS and cervical disc herniations.  (Tr. 143).

Plaintiff returned to Dr. Junn in May 2001.  (Tr. 163).  Dr. Junn noted that Plaintiff's complaints remained the same despite her use of elbow and wrist splints.  Plaintiff also reported that

-7-

She was participating in physical therapy with "questionable benefit." *Id.* An examination revealed that Plaintiff had full range of motion in both shoulders, elbows, and wrists. No specific muscle weakness was noted in any muscle group. Plaintiff's reflexes were intact. A Phalen's sign was negative. Plaintiff did have tenderness and palpable radial and ulnar pulses bilaterally. *Id.* Dr. Junn noted that Plaintiff's subjective complaints related to her ulnar nerve for which there was not EMG corroboration. He further stated that given the mild nature of Plaintiff's subjective symptoms he was reluctant to recommend surgery. Dr. Junn recommended that Plaintiff continue conservative treatment and seek consultation with an orthopaedic surgeon to rule out radial extensor tendinitis. (Tr. 164).

Plaintiff was examined by Dr. Peter Tang, an orthopaedic surgeon, on May 29, 2001. Plaintiff told Dr. Tang that physical therapy had significantly improved her cervical arthrosis symptoms. She also stated that the numbness in her hands only bothered her every few days. Plaintiff's primary complaints related to her third, fourth, and fifth digits although her symptoms were improving with the wrist splints and rest. (Tr. 165). She was no longer taking Naprosyn or Flexeril. *Id.* An examination revealed a full range of motion in Plaintiff's wrists, hands, elbows, and shoulders with full muscle strength. Wrist extension and flexion were to 70 degrees bilaterally, grip strength was 20/20 on the right and 20/30 on the left, pinch strength was 7/8 on the right and 9/9 on the left. There was no evidence of thenar atrophy, tingling, or numbness and Plaintiff was neurologically intact. *Id.* Dr. Tang diagnosed Plaintiff with mild CTS and cervical osteoarthritis. *Id.* He recommended that Plaintiff continue undergoing physical therapy and wearing her wrist splints. Dr. Tang also released Plaintiff to work with restrictions against no rapid, repetitive motions with both hands for 6 months. (Tr. 166, 167). Plaintiff was to follow-up with Dr. Tang as needed. (Tr. 167).

-8-

Plaintiff was seen by Dr. Robinson in July 2001. (Tr. 169). Plaintiff reported to Dr. Robinson that she had been asked by her employer to do work outside of the restrictions given to her by Dr. Tang so she had walked off the job. Plaintiff also stated that she had never undergone physical therapy that was ordered several months ago for her arms because she was told that her symptoms were too acute. Upon examination, Plaintiff had full muscle strength in her upper extremities and a full range of motion in her neck although some tenderness was noted. (Tr. 170). Dr. Robinson reordered physical therapy and gave Plaintiff a work excuse note for the day. *Id.*

Plaintiff was examined by Dr. Anjanette Stoltz in May 2002 at Defendant's request. (Tr. 279-82). Plaintiff told Dr. Stoltz that she had difficulty grasping objects such as a comb due to her CTS. She also stated that she sometimes experienced painful episodes in which she could not move her neck. Plaintiff could not estimate how long she could sit, stand, or walk but indicated that she did not need an assistive device to walk. She believed she could consistently lift 4 pounds comfortably but never more than 10 pounds. (Tr. 279). Dr. Stoltz observed that Plaintiff's walking was unimpaired. Tinel's and Phalen's signs were negative. Plaintiff did not participate in range of motion testing in her cervical spine due to reported pain. Plaintiff was able to fully use her hands. (Tr. 280-81). Plaintiff's motor and sensory functions as well as reflexes were intact and there was no evidence of radiculopathy. (Tr. 281). Dr. Stotlz concluded that Plaintiff should continue wearing her wrist splints and taking Flexeril and Naprosyn to manage her neck pain. *Id.*

On June 12, 2002 a state agency physician reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity "(RFC)" Assessment form. (Tr. 283-90). The physician concluded that Plaintiff had the RFC to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk/sit for about 6 hours in an 8-hour workday; and (3) occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 284-85). The physician further noted that

Plaintiff had no manipulative limitations but should avoid concentrated exposure to environmental pollutants and hazards. (Tr. 287).

Plaintiff returned to Dr. Robinson in February 2004 for complaints of pain in her left shoulder, upper back, and neck. (Tr. 296). Plaintiff reported that she was taking Tylenol #3, ibuprofen 800 mg, and regular Tylenol for her pain. *Id.* An examination showed that Plaintiff had diffuse muscle spasms in her neck with a limited range of motion and tenderness in her left shoulder. *Id.* Dr. Robinson increased Plaintiff's dosage of Neurontin. *Id.*

In March 2004 Plaintiff was treated by another physician at Henry Ford for complaints of constant neck pain which radiated into her upper extremities. (Tr. 298). Plaintiff stated that her pain was exacerbated by any physical activity and even lying down. Medications helped to partially relieve her pain. Plaintiff also reported that she had difficulty sleeping due to the pain and that she had weakness and numbness in her upper extremities. Plaintiff had good muscle strength in both upper extremities upon examination and her sensations were intact. (Tr. 298-99). The physician recommended that Plaintiff have a cervical epidural injection. (Tr. 299). Plaintiff subsequently received an epidural injection in May 2004. (Tr. 306).

Plaintiff was seen by Dr. Kristopher Aalderink at Henry Ford in June 2004. Plaintiff told Dr. Aalderink that her CTS symptoms had worsened since receiving her epidural injection. Dr. Aalderink noted that Plaintiff had reproducible paresthesias of her fingers with a positive Tinel's and Phalen's signs bilaterally. However, no muscle weakness or thenar atrophy was apparent and Plaintiff's sensations were intact. Dr. Aalderink recommended that Plaintiff continue to wear her wrist splints at night and a follow-up EMG was ordered. (Tr. 307-08). Plaintiff underwent a second cervical epidural injection in July 2004. (Tr. 312).

Plaintiff's complaints of increased CTS symptoms and neck pain continued.  (Tr. 313-14). An EMG again showed mild bilateral median CTS but no upper extremity radiculopathy or plexopathy.  (Tr. 342).  An MRI showed degenerative changes to Plaintiff's mid to lower cervical spine with flattening of the spinal cord at C4-C5 and C5-C6. (Tr. 337).

Plaintiff elected to have a carpal tunnel release surgery on her right hand in October 2004. (Tr. 314, 315-16).  Plaintiff reported two weeks later that she had some improvement in her CTS symptoms.  Plaintiff's remaining symptoms were associated with her cervical spine stenosis for which Plaintiff was scheduled to have surgery.  (Tr. 319).

On November 30, 2004 Plaintiff underwent an anterior cervical disectomy and fusion at C4-C5 and C5-C6 with anterior cervical plating.  (Tr. 321).  Plaintiff was discharged from the hospital on December 6, 2004.  At that time, she had achieved good pain control with medication although she had some right tricep weakness and decreased grip strength.  (Tr. 323).  Plaintiff was expected to be on disability for 65 days.  She was advised to avoid strenuous activity for 4-6 weeks, including lifting greater than 10-15 pounds, overhead work, smoking, and driving until the cervical collar was discontinued.  (Tr. 325). Post-surgical x-rays showed stable fusion with some disc space narrowing. (Tr. 340-41).

Plaintiff reported in February 2005 that the symptoms associated with her CTS were much improved.  She was neurovascularly intact with a mild decrease in right hand grip strength. Discussions regarding a carpal tunnel release on Plaintiff's left hand were reserved until she recovered from her back surgery.  (Tr. 330).

## IV.   HEARING TESTIMONY

### A.   Plaintiff's Testimony

-11-

Plaintiff was 54 years old when she testified before the ALJ. (Tr. 404). She had a high school education and had taken some college courses. (Tr. 403-04). Plaintiff testified that she was unable to work due to degenerative disc disease, CTS, and bipolar disorder. (Tr. 390). Plaintiff believed that her bipolar disorder was the impairment that most affected her ability to work. (Tr. 391).[5] Dr. Brooks testified that the evidence showed essentially normal mental functioning in 2001 to 2002 and that there was no evidence of mental health treatment in 2000 or after March 2002. (Tr. 392-93).

**B.    Medical Expert Testimony**

**1.    Mental Health Expert**

Dr. James Brooks testified as a medical expert regarding Plaintiff's alleged bipolar disorder. (Tr. 392-96). The ALJ asked Dr. Brooks whether Plaintiff's disorder as alleged would totally preclude Plaintiff from working. (Tr. 392). Dr. Brooks testified that he did not see any evidence in Plaintiff's medical records that she suffered from current symptoms associated with bipolar disorder. He noted that the various medical reports included a diagnosis of bipolar disorder but that the diagnoses were based upon Plaintiff's reported history of such a condition. *Id.*

**2.    Physical Health Expert**

Dr. Mark Stevens also testified as a medical expert. (Tr. 393-96). The ALJ asked Dr. Stevens whether Plaintiff's degenerative disc disease and CTS caused severe enough symptoms to totally preclude Plaintiff from working. (Tr. 393). Dr. Stevens testified that he did not believe Plaintiff's symptoms were severe enough to preclude all work. *Id.* Rather, he opined that Plaintiff was capable of light work activity. (Tr. 394).

**C.    The Vocational Expert's Testimony**

----

[5]    The bulk of Plaintiff's testimony during the June and August 2005 hearings consisted of clarification regarding the source of Plaintiff's income in 2002 and the nature of Plaintiff's prior work as a computer technician.

Ms. Gail Corn, a rehabilitation counselor, testified as a vocational expert at the August 2005 hearing.  (Tr. 36, 396-408).  Ms. Gail testified that the physical aspect of Plaintiff's past work as a "computer technician" was consistent with the job of a displayer and involved semi-skilled work at the medium exertional level.  (Tr. 401).  Ms. Gail also stated that Plaintiff had computer operation skills that would transfer to work at the light and sedentary level and that Plaintiff's skills were transferrable to computer technician work at the light exertional level.  (Tr. 402, 407-08).

## V.   STANDARD OF REVIEW

Title 42 U.S.C. § 405(g) gives this Court jurisdiction to review the Commissioner's decisions. Judicial review of those decisions is limited to determining whether her findings are supported by substantial evidence and whether she employed the proper legal standards.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson,* 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  It is not the function of this court to  try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

In determining whether substantial evidence supports the Commissioner's decision, the Court must examine the administrative record as a whole. *Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even where substantial evidence also supports the opposite conclusion and the reviewing court would decide the matter differently.  *Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999).

## VI.   LAW AND ANALYSIS

-13-

### A.      Framework for Social Security Disability Determinations

The Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis.  In the first four steps, Plaintiff had to show that:

(1)      he was not presently engaged in substantial gainful employment; and

(2)      he suffered from a severe impairment; and

(3)      the impairment met or was medically equal to a "listed impairment;" or

(4)      he did not have the residual functional capacity (RFC) to perform his relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(e); 20 C.F.R. § 416.920(a)-(e). If Plaintiff's impairments prevented him from doing his past work, the Commissioner would, at step five, consider his RFC, age, education and past work experience to determine if he could perform other work.  If not, he would be deemed disabled. 20 C.F.R. § 404.1520(f).  The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform."  *Her*, 203 F.3d at 391.

### B.      Analysis

#### 1.      The ALJ's Step Two Findings

At step two[6], the ALJ found that Plaintiff had the following "severe" impairments: status post-cervical fusion and CTS.  (Tr. 17-19).  He further concluded that Plaintiff had a non-severe mental impairment.  *Id.*

The Act defines a non-severe impairment as an impairment or combination of impairments that "does not significantly limit . . . [ a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The Commissioner has prescribed rules for evaluating the existence and severity

---

[6]      At step one of the sequential analysis, the ALJ noted that there was conflicting evidence regarding whether Plaintiff had engaged in substantial gainful activity since her alleged onset date.  The ALJ ultimately resolved the issue in Plaintiff's favor.  (Tr. 17).

of mental impairments. *See* 20 C.F.R. § 404.1520a. The Commissioner first determines whether there is a medically determinable mental disorder specified in one of nine diagnostic categories. *See Ibid.*; 20 C.F.R. Pt. 404. Subpt. P, App. 1 § 12.00A. The clinical findings are referred to as the "A" criteria. Thereafter, the Commissioner measures the severity of a mental disorder in terms of functional restrictions, known as the "B" criteria, by determining the frequency and intensity of the deficits.

According to 20 C.F.R. § 404.1520a(c)(3), the "B" criteria require an evaluation in four areas with a relative rating for each area. Thus, the Commissioner must evaluate deficits in activities of daily living and social functioning and rate those on a five-point scale ranging from none, mild, moderate, marked, and extreme. Limitations in a third area of concentration, persistence, or pace are rated on the same five-point scale. The fourth area of deterioration or decompensation in work or work-like settings calls for a rating of never, one or two, three, and four or more. "The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity." 20 C.F.R. § 404.1520a(c). The regulations state that if "we rate the degree of your limitations in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) are not severe. . . ." 20 C.F.R. § 404.1520a(d)(1).

The ALJ's assessment of the above-mentioned criteria is consistent with Dr. Kademian's opinion. Furthermore, the ALJ's finding was supported by Dr. Brooks who testified that the evidence did not demonstrate that Plaintiff had symptoms associated with a bipolar disorder and who emphasized that there was no evidence of any mental health treatment in 2000 or after March 2002. The ALJ also noted that Plaintiff was originally diagnosed with bipolar disorder. However, when Plaintiff was partially hospitalized in July 2001, it was determined that she did not have a bipolar disorder but was depressed. Accordingly, Plaintiff's medication was altered and her symptoms consequently improved. Upon discharge, Plaintiff's GAF score was 65, indicating mild symptoms.

-15-

The ALJ also cited to specific examples in the record to support his determination that Plaintiff's functional limitations were only mild.  For example, Plaintiff's daily activities included caring for her own grooming and for her children, preparing meals, driving, shopping, making repairs, doing laundry and dishes, vacuuming, sewing, reading, and sometimes fishing.[7]  (Tr. 122-39).  Although Plaintiff reported having problems with co-workers, she had very few friends, and she displayed irritation with family members, the evidence also showed that she got along with others, talked on the telephone regularly, went out to eat and to the movies, visited with friends and family, and was cooperative during interviews.  (Tr. 122, 124, 132-33, 191, 195-261).  The objective evidence also showed that Plaintiff did not demonstrate problems with concentration, attention, or memory and Plaintiff reported that she was able to handle her own finances, pay bills, and read technical articles.  (Tr. 124, 132, 195-261).  Given this evidence as whole, the Court concludes that substantial evidence supports the ALJ's step two findings.

### 2.   The ALJ's Step Three Findings

The ALJ found at step three that Plaintiff's post-cervical fusion and CTS did not meet or equal the criteria for Listings 1.04 and 11.14.  (Tr. 19).  Disability under Listing 11.14 requires a finding of peripheral neuropathy "[w]ith disorganization of motor function as described in 11.04(B), in spite of prescribed treatment."  20 CFR Pt. 404, Subpt. P, App. 1 §11.14.  Paragraph 11.04(B) describes significant and persistent disorganization in two extremities which "result[s] in sustained disturbance of gross and dexterous movements . . .." 20 CFR Pt. 404, Subpt. P, App. 1, § 11.04.[8]  Although Plaintiff

---

[7]     The credibility of Plaintiff's assertion that many of her activities of daily living were nevertheless hampered by constant and severe pain is addressed below.

[8]     "Persistent disorganization of motor function" refers to "a form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances . . .. [t]he assessment of impairment depends upon the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms." 20 CFR Pt. 404, Subpt. P, App. 1

was diagnosed with bilateral CTS, the records consistently describe her condition as mild rather than significant. (Tr. 149, 155, 163, 165, 330, 342). It was noted in that there was no evidence of radiculopathy despite Plaintiff's cervical spine condition. (Tr. 149, 281, 342). Plaintiff generally had a full range of motion and full muscle strength in her upper extremities and her reflexes and sensations were intact. (Tr. 150, 154-55, 163, 165, 170, 280-81, 298-99, 307-08). In May 2001 Plaintiff had full grip strength on the right with only slightly diminished pinch strength. She had slightly diminished grip strength but full pinch strength on the left. (Tr. 165). Dr. Stoltz noted in May 2002 that Plaintiff had full use of her hands. (Tr. 280-81). There were no treatment records from 2003. After Plaintiff's hand surgery in late 2004 it was noted that Plaintiff had only a mild decrease in grip strength. (Tr. 323, 330).

The criteria for listing 1.04 requires nerve root compression resulting in limited range of spinal motion, motor loss (muscle atrophy or weakness) with associated sensory or reflex loss, *id.* § 1.04A; arachnoiditis with severe burning or painful dysesthesia resulting in the need for postural changes more than once every two hours, *id.* § 1.04B; or spinal stenosis resulting in the inability to ambulate effectively, *id.* § 1.04C. There is substantial record evidence that Plaintiff did not have a limited range of spinal motion, muscle weakness, or sensory/reflex loss within the relative time period. There were no tests indicating that Plaintiff had arachnoiditis or dysesthesia. Lastly, there was no objective evidence that Plaintiff's ability to ambulate was impaired. Given this evidence, the ALJ properly determined that Plaintiff's impairments were not equal in severity to any listed impairment.

### 3.    The ALJ's RFC Finding

---

§ 11.00(C).

After making his step three determination, the ALJ then assessed Plaintiff's RFC and found that she was capable of performing light work.[9] (Tr. 19). The ALJ commented that the light exertional level was consistent with the objective, medical evidence. The ALJ noted that in 2000 Plaintiff's CTS was described as mild and there was no evidence of cervical radiculopathy. Plaintiff also had a full range of motion in her neck with 5/5 strength in her upper extremities. In 2001 Plaintiff's CTS and cervical arthrosis had improved with treatment. Plaintiff still had a full range of motion in her hands, wrists, elbows, and shoulders with no thenar wasting. She retained 5/5 muscle strength and was neurologically intact. In 2002 Plaintiff was not limited in the use of her hands, her gait was unimpaired, there was no evidence of radiculopathy, and Plaintiff was neurologically intact. The ALJ also noted a gap in treatment history between May 2002 and 2004.[10] Thereafter, Plaintiff underwent surgery on her right wrist and cervical spine in late 2004. By early 2005 it was noted that Plaintiff was neurologically intact with stable fusion of her cervical spine and only mild right hand grip strength.

---

[9] Light work "involves lifting no more than 20 pounds at a time with frequent lifting carrying of objects weighing up to 10 pounds" and " a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). It is assumed that a claimant who can perform light work can also perform sedentary work unless there are limitations placed upon the claimant has "loss of fine dexterity or inability to sit for long periods of time. *Id.* To be capable of sedentary work, a claimant must be able to stand and walk for 2 hours and to sit for 6 hours out of an 8 hour workday. S.S.R. 83-10. To perform light work, a claimant must be able to stand or walk, on and off, for 6 hours out of an 8 hour workday and to sit intermittently throughout the workday. *Id.*

[10] The ALJ stated that the gap in treatment occurred between May 2002 and August 2004. However, there is evidence that Plaintiff had seen doctors at Henry Ford for her neck, back, and CTS on three occasions in February, March, and June 2004. She had also received epidural injections in May and July 2004. During this time period, Plaintiff had neck muscle spasms, a limited range of motion in her left shoulder, and positive bilateral Tinel's and Phalen's signs. However, she also had good muscle strength, no thenar atrophy, and intact sensations. This evidence still demonstrates a treatment gap of over 1 ½ years and, as a whole, does little to bolster Plaintiff's case. Therefore, any error on the ALJ's part was harmless.

-18-

The ALJ also noted that his RFC determination was consistent with the opinion of the state agency physician and with the testimony of Dr. Stevens. Furthermore, it was not inconsistent with any of the opinions of Plaintiff's treating physicians. As noted by the ALJ, Plaintiff's treating physicians did place temporary restrictions upon Plaintiff's ability to work. However, no permanent restrictions were imposed.[11]

Plaintiff's testimony and subjective complaints regarding the extent of her pain and limitations, if accepted as credible, might support a finding that she is incapable of engaging in substantial gainful activity at the light exertional level.

With regard to Plaintiff's allegations of disabling pain, Social Security regulations prescribe a two-step process. The plaintiff must show objective, medical evidence of an underlying medical condition and: (1) objective medical evidence to confirm the severity of the alleged pain rising from the condition; or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. 20 C.F.R. § 404.1529(b); 20 C.F.R. § 416.929(b); *Jones v. Sec'y of Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (citing *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)). If a plaintiff establishes such an impairment, the ALJ then evaluates the intensity and persistence of the plaintiff's symptoms. 20 C.F.R. § 404.1529(c); 20 C.F.R. § 416.929(c); *Jones*, 945 F.2d at 1369-70. In evaluating the intensity and persistence of subjective symptoms, the ALJ considers objective medical evidence and other information, such as what

---

[11]     Dr. Robinson released Plaintiff from work between February and April 2001 without conducting any examinations and she noted no specific limitations associated with Plaintiff's cervical spine or CTS to support the work release. Similarly, Dr. Robinson restricted Plaintiff to limited gripping, grasping, and carrying with both hands for May 2001 without citation to any examination findings. An ALJ is not required to defer to a treating physician's opinion regarding the nature and severity of a claimant's condition if it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997).

-19-

may precipitate or aggravate the plaintiff's symptoms, what medications, treatments, or other methods plaintiff uses to alleviate his symptoms, and how the symptoms may affect the plaintiff's pattern of daily living. *Id.*; Social Security Ruling ("SSR") 96-7p.

Moreover, because pain is a largely subjective matter, an ALJ may properly consider the claimant's credibility in evaluating her complaints of disabling pain. *See Walters*, 127 F.3d at 531. "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Id.* Furthermore, an ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *See id.*

The ALJ properly applied the above-regulations and made the following credibility assessment:

> In summary, I do not find the claimant's allegations of pain, other symptoms, and functional limitations entirely credible. Although I accept her allegations that her symptoms limited her functional capacity to a moderate degree, she is not credible to the extent that her capacity was so limited that she was unable to engage in substantial gainful activity consistent with the residual functional capacity that I have assessed.

(Tr. 21).

In making his credibility assessment, the ALJ specifically considered the factors set forth in 20 C.F.R. § 404.1529(c)(3), 416.929(c)(3), and SSR 96-7p. The ALJ recapped his earlier findings regarding the objective evidence, which he concluded did not support Plaintiff's complaints of constant and intense pain. He also reiterated that Plaintiff's physician had not imposed permanent functional limitations. (Tr. 21). The ALJ further considered that Plaintiff took several medications over the years but cited to several examples in the record of Plaintiff's non-compliance with her medication and noted that there was no evidence of significant medicinal side effects. (Tr. 21, 175, 179, 196, 221, 244, 258, 331). The ALJ additionally commented that Plaintiff had experienced improvement in her CTS with

-20-

the use of wrist splints and in her cervical spine arthrosis as a result of physical therapy. When Plaintiff's complaints resumed in 2004, she was effectively treated with surgery. (Tr. 21). The ALJ also noted that Plaintiff's daily activities undermined her complaints of constant disabling pain. The ALJ cited to Plaintiff's ability to attend to her own personal needs and grooming, care for her children, prepare meals, drive, grocery shop, make repairs, wash dishes, do laundry, vacuum, read technical books/articles, listen to music, sew, and fish. (Tr. 120-39). He also found it significant that Plaintiff had been able to work during the relevant time period despite her complaints. *Id.*

Based upon this evidence as a whole, the court finds that there is ample record support for the ALJ's conclusion that Plaintiff remains capable of performing light work and is therefore not disabled.[12]

## VII.   CONCLUSION

The Court recommends that Defendant's unopposed Motion for Summary Judgment be **GRANTED** (Docket # 15) and that Plaintiff's complaint be **DISMISSED**.

## IX.   NOTICE TO PARTIES

Either party to this action may object to and seek review of this Report and Recommendation, but must act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary*, 931

---

[12]   Based upon his RFC assessment, the ALJ concluded at step four that Plaintiff could perform her past, relevant work as a computer technician at the light, exertional level based upon the VE's testimony. (Tr. 22). The ALJ also made an alternative step five finding that Plaintiff was not disabled as directed by the Medical-Vocational Guidelines. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 2, Table No. 2, Rules 202.07 and 202.15. *Id.* These unchallenged findings provide substantial evidence to support the ALJ's finding that Plaintiff was not disabled.

F.2d 390, 401 (6th Cir. 1991). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: April 17, 2007                          s/ Mona K. Majzoub
                                               **MONA K. MAJZOUB**
                                               **UNITED STATES MAGISTRATE JUDGE**

**<u>PROOF OF SERVICE</u>**

I hereby certify that a copy of this Report and Recommendation was served upon Bonita Currie and Counsel of Record on this date.

Dated: April 17, 2007                          s/ Lisa C. Bartlett
                                               **Courtroom Deputy**